Michael R. Davis
MRD Franchise Consulting
128 Eagleview Circle
Pottsboro, TX 75072
Mdavis5482@hotmail.com
214-695-7463

Carmen D. Caruso, Esq.
Carmen D. Caruso PC
77 West Wacker Drive, Suite 4800
Chicago, IL 60601

Dear Mr. Caruso:

    The purpose of this letter is to provide a professional opinion on three topics at issue in the matter of <u>RWJ Management Company, Inc. et. al. v. BP Products North America, Inc. ("BP") et. al.</u> (the "Lawsuit") - based upon the information provided to me and which I reviewed. This is a preliminary opinion and I reserve the right to modify my opinion in any way based upon my review of additional materials in the matter. I was retained in this matter as of October 4, 2010. At that time I signed the Protective Order in the Lawsuit. I look forward to having the opportunity to see and hear additional information, evidence and testimony in the trial of the Lawsuit.

    I express my gratitude to the Court and opposing counsel for allowing me one additional week to submit this preliminary opinion in view of my unavailability due to three trips to the Texoma Medical Center Hospital Emergency Room, seven total days in the hospital at TMC and Baylor Hospital – Plano and several doctor visits.

<u>Background</u>:

1.     <u>Education:</u> BA in History from the University of Oklahoma in 1970 and a JD from the University of Oklahoma in 1973. Admitted to the Bar in 1973. A resume is attached as Exhibit A.

2.     <u>Employment</u>:
   - 1972 – 1974 – employed by United Founders Life Insurance Company (Oklahoma City and Chicago) as staff assistant, staff attorney and Assistant General Counsel. Taught insurance law basics to the company's staff
   - 1974 – 1976 – Kerr-McGee Corporation (Oklahoma City) – staff attorney. Principal responsibilities included providing legal advice regarding issues with retail gasoline dealers.
   - 6/1976 – 4/2008 - The Southland Corporation/7-Eleven, Inc. – Staff Attorney, Assistant Secretary, Assistant General Counsel, Franchise Department Manager and Vice President of Franchise Integration.


EXHIBIT A

Carmen D Caruso, Esq.

- o I served as Lead counsel regarding all franchise related matters and supervised a staff of up to eight lawyers and two legal assistants.
- o As the franchise Department manager for approximately two years I had P & L responsibility for the department and made all related appropriate business decisions.
- o I drafted and was responsible for approximately 12 new franchise agreements, including one that was signed by over 98% of the existing approximately 3400 franchisees. During this process I reviewed dozens of other franchisor disclosure documents, agreements and related materials.
- o I was responsible for day to day advising 7-Eleven employees on disclosure to and actions and communications with franchisees regarding the registration of the franchise, selling of the franchise and operating a franchise system. As such, and through the learning obtained to teach graduate students about franchising I became knowledgeable about commercially reasonable and accepted franchisor practices.

- Mid 1980's – Adjunct Professor, Dallas Community College District – Eastfield campus – taught Business Law.
- Early to mid 2000s – Adjunct Professor, University of Dallas, Graduate School of Management – Taught a general franchising course. The course entailed the study of numerous franchise systems and practices, as well as the accepted standards for franchisors in operating franchise systems.
- Early and mid 2000s – requested presenter to Southern Methodist University Law School on international franchising tin International law courses.

3. Affiliations and Professional Activities:
  - Member of the International Franchise Association, serving as Vice Chairman of the IFA's Legal/Legislative Committee and Founding Chairman of the IFA's Corporate Counsel Subcommittee. The Corporate Counsel Subcommittee was composed of numerous franchisor counsel and discussed various topics including disclosure, best practices, meeting legal and other requirements, generally accepted practices and other topics. I also made numerous presentations and presented franchise related papers at the American Bar Association Forum on Franchising, the IFA's Franchise Legal Symposium, Practicing Law Institute seminars and others.
  - Founding Vice-Chairman, Chairman and Board Member of the Dallas Bar Association Subcommittee on Franchising and made several forum presentations and presented papers on various franchise subjects.
  - Conducted over 50 seminars to 7-Eleven executives, personnel, departments, vendors and others on basic franchise law, operations, the 7-Eleven System, disclosure and relationships.

Carmen D Caruso, Esq.

- A partial list of presentations and papers is attached as Exhibit B.

Lawsuit Background: The basic background and contested elements of this dispute are set out in the pleadings to the Lawsuit and will not be repeated here. I have attached as Exhibit C a list of various materials reviewed in preparation of this opinion.

Franchising Background and Generally Accepted Requirements:

1. In dealing with these issues, my purpose is not to opine on the specific legal aspects of the Lawsuit, but to review various actions under what are the generally accepted practices in franchising and to discuss the general industry standards and practices by franchisors in acting in good faith and fair dealing in their interactions with franchisees.

2. A franchise is a very complex relationship where the franchisee must rely extensively upon the franchisor to develop and optimize a valued brand, deliver a workable business concept and provide adequate ongoing support. Because of these and other factors all franchisees have reasonable expectations that the franchisor must meet in order for the franchisee to have a reasonable opportunity to succeed.

3. This is especially true in situations like the Plaintiffs' situation where the franchise agreement had a 20 year term and also had a non-competition deed restriction in it. That effectively rendered the franchisee's ability to terminate the franchise for a breach of the franchise agreement by the franchisor valueless as the franchise could not operate a business, or sell to someone who wanted to operate a business, that was in any way similar to the existing business on the franchise site.

4. All responsible franchisors recognize their obligations to their franchisees and should attempt to deal with them in good faith and with fair dealing. A significant part of a franchisor's dealing with franchisees is to recognize how important the relationship itself is and how franchisees react to all actions taken by the franchisor. An accepted concept franchisors study in dealing with franchisees is the use the E-Factor©, developed by Greg Nathan. This concept traces the feelings of a typical franchisee beginning with a "Glee" status when the franchise begins. This is an excited and happy stage at the anticipation of operating a successful business. The concept then moves through the various moods of the franchise during the term of the franchise. This perception by the franchise can quickly turn angry, especially where a franchisor does not live up to the franchisees commercially reasonable expectations. Meeting and managing those expectations is critical to a successful franchise.

Lawsuit Issues: The principal purpose of the preliminary report is to opine on three issues raised in the Lawsuit. These are: (1) whether the disclosure by BP of its franchises (BP Connect/Wild Bean and AMPM) generally met accepted

Carmen D Caruso, Esq.

franchise industry standards and practices for compliance with appropriate Federal and State registration and disclosure requirements; (2) whether the actions of BP in developing, implementing, selling and operating the franchises, as well as changing brands and methods of supply, met the general franchise industry standards, including meeting the general franchise accepted actions for dealing with franchisees in good faith and fairly; and (3) whether the actions taken by BP in their ongoing operation of the franchise could have created a breach of the franchise agreement and/or violated generally accepted franchise standards.

1. Disclosure:
   - Responsible franchisors meeting generally accepted franchise standards always ensure that the franchise is fully registered and the disclosure documents and process for selling the franchise is conducted as required before beginning any efforts to sell a franchise.
   - In this case, non-refundable funds (except for very limited circumstances) were apparently paid by the plaintiff for each site before the Uniform Franchise Offering Circular ("UFOC") was provided. While BP claims to have delivered a UFOC at an early date, it does not have a receipt for the UFOC, as reasonable disclosure standards for meeting applicable laws require. Accepted practice among responsible franchisors is always to ensure a receipt is obtained and franchisors generally have systems in place to ensure that occurs.
   - The materials I reviewed shows that BP required the signing of a purchase and sale agreement with an obligation to sign the BP Connect franchise agreement, along with the payment mentioned above, before the UFOC was presented. This appears to have happened not once but with each sale of properties to the plaintiff. It is accepted and appropriate practice in franchising to always instruct sales personnel that there can be no money taken and no discussion about the franchise with the prospective franchisee <u>before</u> proper disclosure is made.
   - BP's practices in disclosing and selling the franchise appear not to have met commercially reasonable and responsible practices acceptable in the franchise industry.
   - In providing information to the plaintiff during the disclosure process, reference was made to using the National Association of Convenience Stores financial data for determining potential return. Documents in the case indicate that initially this approach was incorrect as those averages were generally not met by the Plaintiffs. In addition, this recommendation appears to have been improper in view of the contemplated changes to the franchise and the gasoline supply arrangements. These changes appear to have caused returns even further below the NACS average. BP documents suggest that employees on the C-Store side of the business did not know what the gasoline side of the business was going to do. However, in selling a franchise a responsible franchisor must do its own due diligence and

Carmen D Caruso, Esq.

> must be aware of and properly evaluate any and all actions to be taken by the franchisor which could harm or otherwise impact the franchisee.

2. BP's actions in developing, implementing, selling and operating the franchises:
   - Although BP had AMPM on the west coast, it separately developed its "BP Connect" and "Wild Bean Café" franchise for select stores on east of the Rockies. This development appears to have been necessitated by an apparent need to reduce overhead. Documents reviewed to date indicate that apparently little study was done on the economics for franchisees for this franchise. The materials produced in the lawsuit contain numerous references to the need for BP to cuts costs and the unprofitability of the company operated stores.
   - When the Plaintiff purchased the sites and franchised the stores, the Wild Bean Café was included. It was an upscale store concept with fresh foods that would attract a different customer from standard C-stores. The Wild Bean franchise also had high-end gasoline which complimented the higher end store offering. Franchisees bought into that concept with expectations that this approach would differentiate their stores, leading to successful operations.
   - Even when BP did some analysis and conclusions were made as to franchisees profits, it appears that BP did not take into account of BP contemplations to change the brand to AMPM and institute a different gasoline supply and other arrangements. Reasonable franchise operating standards dictate that BP knew or should have known these changes could significantly change the economics to the franchisee and reduce revenue to the franchisee.
   - The switch to "AMPM" was apparently made with limited testing in corporately operated stores and with little analysis of the impact to the franchisee. Documents in the lawsuit indicate that as soon as the BP Connect/Wild Bean franchise was sold, BP employees noted that the operation was not effective, but it continued to be sold.
   - This change to the AMPM brand was made quickly after selling the Wild Bean franchise and BP's documents indicate that this was caused by BP's expressed need to reduce costs. The AMPM brand appears to have been successful on the west coast, principally due to its discounted gas and a different type of customer. This switch, coupled with the change to jobber supplied gasoline at a significantly higher cost, appears to have caused the Plaintiff to further reduce revenue. The extent of this impact does not appear to have been properly considered by BP in accordance with commercially reasonable franchise standards.
   - Generally acceptable franchisor practices dictate that much more analysis of the impact of changes to the franchise system must be done before implementing them. BP's lack of the actions noted above appear to have violated what would be considered generally accepted franchising standards of contact and do not appear to be in accordance the generally accepted principals of acting the Good faith

Carmen D Caruso, Esq.

and fair dealing with its franchisees. Although BP had contractual discretionary rights to make certain changes, the exercise of these rights should be made in a commercially reasonable manner, especially where a contract is one sided and not subject to much, if any, negotiation.

3. BP's actions in operating the franchise:
   - Throughout the materials I reviewed there are to numerous problems caused by BP in the operation of the franchise. These include the change to Jobber supplied gasoline, requiring products to be sold at certain prices; a computer system that while highly touted reportedly caused numerous problems for franchisees in the operation of the store; and a general lack of responsiveness to problems of the franchisees. The problems with the operating system appear to be extremely serious as all franchisees reasonably expect that the basic operating system provided by the franchisor (but paid for by the franchisee) will provide such a system which will allow them to operate successfully. Without a good operating system franchisees generally fail and the problems with Radiant and Retalix (one was introduced and then quickly replaced) which have lasted about two years shows that BP apparently did not properly deal with this and the other problems. Although it appears a further roll out of Retalix was delayed in other areas by BP, the back office issues appear to continue in the Plaintiffs' stores. This lack of solutions to the franchisees' problems would seem to violate generally accepted standards for franchisors in operating a system.

Based upon my review to date, my opinion is that BP appears not to have met acceptable franchise standards and practices in the disclosure, selling, operation and support of the franchise. In addition, the general duty of Good Faith and Fair Dealing appears not to have been met. This opinion is based upon my review of materials in the Lawsuit to date and I reserve the right to modify the opinion based upon further review.

Very Truly Yours:

Michael R Davis

Michael R. Davis
Principal – MRD Franchise Consulting

Carmen D Caruso, Esq.

Enclosures:
Resume
Selected Published Articles
Partial List of Materials Reviewed.

Carmen D Caruso, Esq.

## Exhibit A

## MICHAEL R. DAVIS

128 Eagleview Circle, Pottsboro, TX 75076
214-695-7463 – Mdavis5482@hotmail.com

### EDUCATION:

**The University of Oklahoma – Bachelor of Science in History - 1970**
**The University of Oklahoma – Juris Doctor in Law – 1973 – Deans Honor Roll 4/6 semesters**

### EXPERIENCE:

- **MRD Franchise Consulting – Owner and principal** – franchise consulting firm – 4/2008 – Present.
- **Vice President – Franchise Administration, Assistant General Counsel and Assistant Secretary – 7-Eleven, Inc.** 1979 – 4/2008 – Retired from 7-Eleven, Inc 4/2008
    o Vice President Franchise Integration– 4/2002 – 4/2008
    o Assistant General Counsel and Assistant Secretary – 4/1979 – 4/2008
    o Assistant Secretary – 1997 – 4/2008
    o Senior Attorney – 6/1976 – 4/1979
- **Franchise Department Manager – 7-Eleven, Inc.** – 1998 – 2000
- **Adjunct Professor – University of Dallas, Graduate School of Management** – Taught franchising related classes – c. 1999 – 2004
- **Periodic requested Instructor at Southern Methodist University Law School** – International Franchising Law – c. – 2000 – 2006
- **Adjunct Professor at Dallas County Community Colleges** – Taught Business Law – c. mid 1980s.
- **Staff Attorney – Kerr McGee Corporation** – 6/1974 – 6/1976
- **Assistant Vice President and Assistant General Counsel – United Founders Insurance Company** – 6/1972 – 6/1974

### Honors/Activities

   o Former Founding Chairman and member of the Corporate Counsel Committee of the International Franchise Association ("IFA").
   o Former Chairman and member of the Legal/Legislative Committee of the IFA
   o Former Founding Vice-chairman, Chairman and member of the Dallas Bar Association Franchising and Distribution Subcommittee
   o Presenter and writer for various organizations, including the IFA, American Bar Association, Practicing Law Institute, Dallas Bar Association and others. A partial list of written and presented materials is attached.

Carmen D Caruso, Esq.

## Exhibit B

## MICHAEL R. DAVIS
## SELECTED ARTICLES PUBLISHED*

1. "How 7-Eleven Developed a New Franchise Agreement and Implemented it in its Entire Franchise System", Three part series. <u>Leader's Franchising Business Law Alert</u>, Leaders Publications (The New York Law Publishing Co. C. 2006.

2. The Perspective of In-House Counsel: Organization, Compliance and Enforcement Programs, Negotiated Sales, Transfer, Termination and Advertising and Franchise Councils" - <u>Business Strategies and Compliance Issues," Practicing Law Institute</u>, New York, New York, February/March 1989. <u>The Corporate Analyst</u>, Vol. 3, No. 1, November, 1990, Business Laws Inc. Revised and reissued in <u>Distribution Counseling</u>, 2001, Business Laws Inc.

3. "Mediation and Other Alternative Dispute Techniques, an Overview" - <u>37th Annual International Franchise Convention</u>, March, 1997, Orlando Florida.

4. "Franchise Law, A Roundtable Discussion," <u>Seminar</u> – Texas. December, 1996 (with Gayle Cannon, Ann Hurwitz, Don McClure, David Milan and Leslie Sharman).

5. "Suggestions for Handling a Prospective Franchisee Disqualification," <u>Leaders Franchising Business & Law Alert</u>, Vol. 2, No. 3, March/May 1996 (with Michelle Chadwick).

6. "The Legal Issues inside the Dual Role Of A Master Franchisee/Sub-Franchisor" - International Franchise Association / International Bar Association <u>13th Annual Seminar - "International Franchising Intensifies"</u>, Washington DC., May, 1996 (with Leonard Polsky and David Bigmore).

7. "Internal Dispute Resolution (How To Cut Off That Dispute At The Courthouse Door)" - International Franchise Association <u>29th Annual Legal Symposium</u>, Washington DC, May, 1996 (With Ann Hurwitz and Kate Stillman).

8. "Alternative Dispute Resolution - Practical Suggestions for a Franchise Organization," <u>American Bar Association Real Talk</u>, Mid-year meeting, Chicago, ILL, March, 1996 (with Kim McCullough and Larry Nelson).

9. "Litigation, Mediation and Conflict Resolution," International Franchise Association <u>- Annual Convention</u>, Honolulu, Hawaii, February, 1996.

Carmen D Caruso, Esq.

10. "Internal Dispute Resolution Techniques – A Review of What Works In Franchising" - International Franchise Association, <u>28th Annual Legal Symposium</u>, Washington DC - May, 1995 (with Andrew Caffee and Sheri Young)

11. The National Franchise Mediation Program – <u>International Franchise Association, Annual Convention</u> February 1995.

12. "Customizing ADR methods for Your Franchise System" - <u>Leaders Franchising Business & Law Alert</u>, Vol. 1, No. 10, July, 1995.

13. "International Dispute Resolution Mechanisms," <u>International Franchise Association - Legal Round Table</u>, Dallas, Texas, April, 1994.

14. "Bankruptcy and the Franchisor" - International Franchise Association, <u>26th Annual Legal Symposium</u>, Washington DC, May, 1993.

15. "Franchising – Alternative Dispute Resolution" – <u>American Bar Association Forum on Franchising</u> October 1992

16. "The Effective Use of Alternative Dispute Resolution Methods in Franchise Organizations," International Franchise Association, <u>25th Annual Legal Symposium</u>, Washington DC, May, 1992 (with Michelle Chadwick and Carole Trocchio).

17. "Alternative Dispute Resolution in Franchise Organizations," International Franchise Association, <u>23rd Annual Legal Symposium</u>, Washington DC, May, 1990.

18. "Combination Franchising," International Franchise Association, <u>22nd Annual Convention</u>, Kauai, Hawaii, January, 1989.

19. "Arbitration" <u>International Franchise Association 20th Annual Legal Symposium</u>, Washington D.C. May, 1987 (with Mark Spooner)

20. "Practical Considerations in Dealing with Franchisee Associations," International Franchise Association, <u>18th Annual Legal Symposium</u>, Washington DC, May, 1985.

\* Note some dates and related information are estimated

Carmen D Caruso, Esq.

# Exhibit C
## List of Materials Reviewed in the Preparation of this Preliminary Opinion

- Amended Complaint, RWJ Management Company, Inc. et al. v. BP Products North America, Inc. et al. (received 10/4/10.
- Meetings and phone calls with Plaintiff, Plaintiff's employees and Counsel beginning 10/4/10.
- RWJ History Timeline,
- Oil Express, 8/24/2009, Volume XXXIII, no. 33
- Various Charts of stations' sales histories, COCO v. Franchised, with and without DTW v. Rack numbers.
- 2006 BP Connect UFOC RWJ002914 (contains all franchise agreement related documents).
- 2007 BP AMPM UFOC RWJ002219.
- 2008 BP AMPM UFOC RWJ001361.
- Addendum to Franchise Agreement RWJ000369
- Various Production Documents including nos. RWJ00037792, 00048690, 00055979, 00148191, 00148191, 000148192, 000157550 – 552, 00148584, 00048716, 00023566 – 67; 00056740; 00048696; 00758584;
- Document entitled "Retalix Issues"
- Lawsuit Protective Order.
- E-mail from William Shaver to RWJ and response – 4/13/09.
- E-mail from RWJ to William Shaver and response – 3/5/09.
- E-mail from Deb Cox to William Shaver and response – 1/30/09.
- E-mail from Deb Cox to various BP employees– 9/18/09 and 9/29/09.
- Various BP bid materials for the sites subject of the Lawsuit.
- RWJ paper to BP entitled "A Great Partnership" which discusses the many problems the Plaintiff was having in its franchise operation.
- Approximately 50 various AMPM Production documents in the range of 00019500 – 000440612.
- Approximately 25 various Vendor Contracts in the range of 00464348 – 00466032.
- Approximately 50 various AMPM Production documents in the range of 00019575 – 00218471.
- Approximately 50 various AMPM Production documents in the range of 00019625 – 00056690.
- Article: "The Duty of Good Faith and Fair Dealing in Commercial Contracts in Massachusetts" – Tory A. Weigand